Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Counsel for Jumbo*
*Seafood Restaurant, Inc.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-90-ELG |
| | ) | (Chapter 11) |
| JUMBO SEAFOOD RESTAURANT, INC. | ) | |
| | ) | |
| Debtor. | ) | |

**JUMBO SEAFOOD RESTAURANT, INC. PLAN OF**
**LIQUIDATION FOR SMALL BUSINESS UNDER CHAPTER 11**

Comes now Jumbo Seafood Restaurant, Inc.. ("Jumbo Seafood" or the "Debtor"), by and through the undersigned, pursuant to the rigors of Official Form 425A, and provides the following plan of liquidation (the "Plan") herein:

**Background for Cases Filed Under Subchapter V**

a. **Description and History of the Debtor's Business**

A pillar of the District of Columbia's business and cultural communities for decades, Jumbo Seafood was formally organized in May 1986 and has proudly operated in the heart of Chinatown ever since. Through the years, myriad presidents and foreign dignitaries have passed through the establishment's doors, as locals and tourists alike have come to rely upon the institution as the preeminent spot for Chinese food in the American capital.

Anthony "Tony" Cheng has tirelessly overseen Jumbo Seafood's kitchen since opening, with his wife, Julie Cheng, presiding over the maître d' stand. The Chengs have greeted consumers ranging from the famous to the anonymous with warmth, exemplary hospitality, and truly unmatched cuisine. The neighborhood has assuredly seen many a change over time, with what is now known as the Capital One Arena opening for business—directly across the street—in 1997, but the Debtor has been a constant, exemplifying the local restaurant scene and, for two immigrant owners, proving a genuine manifestation of the American dream.

The economy has not always proven as resilient as Jumbo Seafood, however. The Debtor's building has long been owned by a separate, insider entity—Cheng & Company L.L.C. (the "Landlord")—and, regrettably, used as cross-collateral for other regional investments. When those regional investments sputtered, a familiar chain reaction ensued, with the Landlord finding its way

1

into this Honorable Court. None of which would, per se, be problematic for Jumbo Seafood, except the Landlord's reorganizational efforts dwindled in due course, inviting a conversion to Chapter 7 and efforts to liquidate the real estate with market-friendly assurances of tenant vacancy.

The events that followed are not amongst the Debtor's proudest or finest. An agreement was reached for Jumbo Seafood to stay open through a cultural holiday and then close shop permanently. That agreement was, no doubt, breached. The Landlord's trustee—quite understandably—sought to oust the Debtor, racing against a creditor-centric clock to auction the premises. This Honorable Court agreed that the United States Marshals Service could aid in evicting Jumbo Seafood. And, at a time when such an eviction pended imminently, this case was filed, openly seeking to frustrate an order of the very court in which the petition for relief was docketed.

Through the hard work of many—ranging from the Landlord's trustee and his counsel, to a chief restructuring officer at the helm of Jumbo Seafood, to the insolvency professionals in both this case and the Landlord's case—the gambit, thankfully, worked. The Landlord's premises have now been sold to a new owner that, upon casting the winning bid, proclaimed a desire to keep the Debtor in business. Numerous creditors of both the Debtor and the Landlord were paid when that sale closed on June 17, 2024, with $7.4 million changing hands at the closing table. And, through it all, Jumbo Seafood has stayed open for business, never suffering the fatalistic step of closing the doors and always offering passersby an opportunity to dine in the same esteemed quarters that once hosted Jimmy Carter, Ronald Reagan, George Bush, Bill Clinton, and so many others for an unmatched culinary experience.

This Plan marks the final stage in the reorganization of Jumbo Seafood. To ensure the doors remain open for generations to come, the Debtor will sell substantially all of its assets to a newly-formed company ("NewCo"), owned by Tony and Julie Cheng. NewCo will enter into a formal lease with the Landlord's successor and, in consideration of the asset transfer from the Debtor, will tender a promissory note in the sum of $200,000.00, payable over five years in 59 equal monthly installments of $3,333.33, with the final payment being in the sum of $3,333.53.

As discussed below, this Plan will return to creditors more than $163,000.00 over and above the liquidation value of the Debtor's assets. The Plan will also allow secured and priority claims (including administrative priority claims) to be paid in full. The Plan will not return monies to general unsecured creditors.

Transparently, the NewCo arrangement is designed to give Jumbo Seafood a true fresh start. The name on the door will not change and the transition, to customers and employees, will be seamless. But after several decades in operation, the Debtor does carry certain bookkeeping baggage, and reorganizational efforts are optimized by allowing a new company to emerge from this case.

    b. **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holds who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as **Exhibit A**.

2

Critically, the District of Columbia has filed a secured claim in the amount of $433,162.81. *See* Claims Register #1. The Debtor is regarding the secured portion of this claim as being in the sum of $36,572.69, insofar as such is the liquidation value of the Debtor's assets and, as such, the amount that could actually be fetched to pay the secured portion of this claim. While the Debtor does seek to pay the full amount of the District of Columbia's priority claim—which is $106,924.27, and which the Debtor credits as not overlapping, at all, with the secured claim—the Debtor has otherwise classified the remainder of the District of Columbia's claim as being unsecured in nature.

As noted in the liquidation analysis, the Debtor has discounted certain categories of assets. For cash and cash equivalents, no discount is applied since such assets are already liquid in nature. For food on hand, a discount of 80% has been applied, since there exists almost no cognizable market for the resale of perishable inventory. Alcohol on hand has been discounted *en toto* since the Debtor would not be permitted to liquidate alcohol through any means other than ongoing operations. Miscellaneous inventory and equipment have been discounted at the rate of 50%, insofar as such is the discount typically applicable to liquidation efforts.

The liquidation analysis does not take into consideration the commission that would be collected by a Chapter 7 trustee, the legal fees that would be incurred by a Chapter 7 trustee, or the legal fees the Debtor would incur contesting any conversion effort. It may be reasonably assumed that these added expenses would further diminish the liquidation value by several thousand dollars.

**c. Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments. Insofar as this is a plan of liquidation, ongoing business expenses are not a material factor. And given that the sale accomplished herein is for a sum certain, the Debtor can rather simply project that its post-confirmation monthly income will be in the sum of $3,333.33 per month, for 59 months, and $3,333.59, in the 60th month. *The whole amount of this income will be devoted to the making of payments under this Plan.*

The Debtor will also have some quantity of cash on hand when the conveyance to NewCo is undertaken, with such cash being used to supplement payments to creditors. Equally, though still being negotiated, the Debtor is cautiously optimistic that it will receive at least $8,000.00 through the compromise is a *sui generis* cause of action.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.    Summary**

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for:    1 classes of priority claims;

1 classes of secured claims;

1 classes of non-priority, unsecured claims; and

3

1 class of equity security holders.

Non-priority unsecured creditors holding allowed claims will not receive distributions hereunder. The Plan also provides for the payment of administrative and priority claims.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.        Classification of Claims and Interests**

| | | |
|---|---|---|
| **Section 2.01** | **Class 1** | The secured claim of the District of Columbia |
| **Section 2.02** | **Class 2** | The priority claims of the District of Columbia and the Internal Revenue Service |
| **Section 2.03** | **Class 3** | General unsecured creditors |
| **Section 2.04** | **Class 4** | Equity interests in the Debtor |
| **Class Identification** | | A schedule of each class and its constituent creditors is appended hereto as **Exhibit B**.[1] |

**Article 3.        Treatment of Administrative Expense Claims and Court**

| | | |
|---|---|---|
| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
| **Section 3.02** | **Administrative Expense Claims** | Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. All professionals including the Debtor's counsel and the Subchapter V Trustee will need to file applications with the Court to seek approval of their fee and expenses as allowed administrative expense claims within 30 days of the Effective Date. |
| **Section 3.03** | **Priority Tax Claims** | Each holder of a priority tax claim will be paid in full not late than March 27, 2029. Given the emphasis of such claims in this Plan, priority tax claims have been expressly classified and comprise Class 2, notwithstanding the prevailing norm of not classifying |

---

[1] The claim of the District of Columbia is twice reflected on Exhibit B, so as to show the component in Class 1 as well as the claim component in Class 2.

priority tax claims. The Debtor does dispute the claim of the Internal Revenue Service, which is currently comprised—largely but not entirely—of certain estimated taxes. The Debtor will work with an accountant to endeavor to resolve issues with the Internal Revenue Service, post-confirmation, and, to the extent necessary, will file an objection to the claim of the Internal Revenue Service.

**Section 3.04  Statutory Fees**  There are no statutory fees due in this case.

**Section 3.05  Prospective Quarterly Fees**  There are no prospective quarterly fees that will be due in this case.

**Article 4.  Treatment of Claims and Interest Under the Plan**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – Secured Claims | Impaired | As discussed in the liquidation analysis above, the Debtor maintains the only secured claim to be that of the District of Columbia and to be in the sum of $36,752.69. This claim will be paid, in full, during the life of the Plan. |
| Class 2 – Priority Claims. | Impaired | The Debtor will pay the priority tax claim of the District of Columbia, in the sum of $106,924.27, within five years of the petition date. The Debtor will also pay the allowed priority claim of the Internal Revenue Service during the same time period though, as noted above, the Debtor does dispute a large portion of the claim of the Internal Revenue Service. *See, supra*, § 3.03. |
| Class 3 – General Unsecured Creditors | Impaired | General unsecured creditors will take nothing under this Plan. |
| Class 4 – Equity interests in the Debtor | Unimpaired | Mr. and Ms. Cheng will retain their equity interest in the Debtor though, as observed *passim*, the Debtor is being liquidated through this Plan. |

5

**Article 5.        Allowance and Disallowance of Claims**

**Section 5.01   Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02   Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03   Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04   Anticipated Disputed Claims**. The Debtor currently intends to object to the claim of the Internal Revenue Service but no other claims. The Debtor will have a period of time equal to three (3) years, from the Effective Date (as defined in Section 8.02, *infra*), to file such an objection.

**Article 6.        Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01   Assumption.** The Debtor does not assume any executory contracts and unexpired leases *except* for those contracts providing for (i) the provision of utility services to any building occupied by the Debtor; (ii) the provision of utility services to the Debtor; (iii) the provision of merchant loyalty rewards, whether in the form of points, coupons, or otherwise, to the Debtor; and (iv) the provision of insurance to the Debtor.

**Section 6.02   Rejection.** The Debtor rejects all executory contracts and unexpired leases not expressly referenced in Section 6.01 hereof.

**Article 7.        Means for Implementation of the Plan**

Within ten (10) business days of the Effective Date (as defined in Section 8.02, *infra*), the Debtor will enter into a contract to convey substantially all of the Debtor's assets, excepting cash on hand and litigation rights, to NewCo.[2] In exchange for the conveyance, NewCo will furnish the Debtor will a promissory note in the sum of $200,000.00, payable over five years in 59 equal monthly installments of $3,333.33, with the final payment being in the sum of $3,333.53. The promissory note will be secured by a UCC financing statement encumbering substantially all the assets of NewCo.

NewCo will make monthly promissory note payments to the Debtor, post-petition, and the Debtor will use the resulting funds to make payments hereunder. Plan payments will be applied (i)

---

[2] For the avoidance of ambiguity, the conveyance *will* include accounts receivable but will *not* include cash on hand or any monies due to the Debtor pursuant to a settlement authorized under Federal Rule of Bankruptcy Procedure 9019.

first, to the retirement of allowed administrative expense claims; (ii) second, to the retirement of Class 2 allowed priority claims; and (iii) third, to the retirement of the Class 1 secured claim. For the first 12 months following the Effective Date, payments will be made on a monthly basis, commencing on the first business day of the first calendar month succeeding the Effective Date. Thereafter, payments will be made on a quarterly basis, on the first business day of every third calendar month. *For ease of administration, the Debtor may have NewCo make payments directly to creditors, in a sum equal to obligations due to the Debtor.*

To whatever extent the Debtor has cash on hand on the Effective Date, such monies will be added to the first payment under this Plan, so as to expedite the retirement of allowed administrative expense claims.

The total sums to be paid under this Plan are estimated to be as follows: (i) Class 1 will receive $36,572.69, being the amount of the secured claim of the District of Columbia. (ii) Class 2 will receive not less than $122,490.27 (being the sum of the District of Columbia's priority tax claim and the amount the Debtor believes to be due to the Internal Revenue Service on account of its priority tax claims) and not more than $147,916.62 (being the sum of the District of Columbia's priority tax claim and the amount of a priority tax claim asserted by the Internal Revenue Service). (iii) Administrative priority claimants will be paid in full. It is estimated that administrative priority claims will be in the approximate sum of $45,000.00—including the claims of the Subchapter V trustee, the Debtor's chief restructuring office, and undersigned counsel—which will be paid through (a) a retainer of $8,874.00 being held by undersigned counsel; (b) cash on hand; (c) settlement proceeds; and (d) payments made by NewCo under the aforementioned promissory note.

**FOR THE AVOIDANCE OF DOUBT OR AMBIGUITY, NEWCO WILL BE AN INSIDER OF THE DEBTOR, OWNED BY THE SAME PERSONS WHO HOLD PRESENTLY OWN THE DEBTOR. NEWCO IS NOT AN ARM'S LENGTH THIRD PARTY ENTITY.**

**Article 8.    General Provisions**

**Section 8.01    Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan.

**Section 8.02    Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03    Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04    Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors or assigns of such entity.

7

**Section 8.05   Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest, with such written notice to be docketed in this case, and sent via certified mail to the Debtor, by the party giving notice.

**Section 8.06   Disbursing Agent.** Dallas Evans, the Debtor's chief restructuring officer, will serve as disbursing agent hereunder.

**Section 8.07   Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 8.08   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the District of Columbia govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.09   Corporate Governance.** For the duration of this Plan, the Debtor shall be prohibited from issuing nonvoting equity securities and the equity holders of the Debtor shall be prohibited from selling, transferring, diluting, alienating, or otherwise altering such interest without leave of this Honorable Court.

**Section 8.10   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of Columbia shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Article 9.    Discharge**

**Section 9.01   Discharge Pursuant to § 1191(a).** If the Debtor's Plan is confirmed under § 1191(a) of the Bankruptcy Code, on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A)

8

of the Bankruptcy Code, except that the Debtor will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided in § 1141(d)(6) of the Bankruptcy Code.

**Section 9.02   Discharge Pursuant to § 1191(b).** If the Debtor's Plan is confirmed under § 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code.

**Section 9.03   Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, and directors.

**Article 10.       Retention of Certain Assets; Disbursing Agent**

**Section 10.01** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all rights arising under Chapter 5 of the Bankruptcy Code shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code—to and through August 1, 2029, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.02** The Subchapter V trustee shall continue in her service to and through the Effective Date. Should this Plan not be confirmed consensually, the Subchapter V trustee will continue in her service until the final payment is made hereunder.

Respectfully Submitted,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No.: MD18071
THE BELMONT FIRM
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Phone: (202) 991-1101
E-Mail: mac@dcbankruptcy.com
*Counsel for the Debtor*